_____

### IN THE UNITED STATES DISTRICT COURT, DISTRICT OF UTAH
### CENTRAL DIVISION

_____

|  |  |
|---|---|
| TREVOR D. STEWART, TODD PHILLIPS, JOE PHILLIPS, H. DELL LeFEVRE, WORTH  : W. BROWN, JAMES N. BROWN, and      WILLIAM F. ALLEMAN,                      : | Civil No. 2:06CV209 TC |

:

Plaintiffs,          :

vs.                                    :

DIRK KEMPTHORNE, Secretary of the  :
U.S. Department of the Interior, UNITED
STATES DEPARTMENT OF THE           :
INTERIOR, BUREAU OF LAND
MANAGEMENT, and BRAD EXTON,        :
Manager of the Grand Staircase Escalante
National Monument,                   :

Defendants,          :

GRAND CANYON TRUST, et al.,          :

Interveners.          :

**ORDER AND MEMORANDUM DECISION AS TO PLAINTIFFS' ADMINISTRATIVE PROCEDURE ACT CLAIMS**

Honorable Tena Campbell

_____

On November 2, 2007, this Court heard oral argument by the parties regarding Plaintiffs'

claims arising under the Administrative Procedure Act ("APA") challenging the January 26,

2006 decision of the Department of the Interior's Administrative Law Judge ("ALJ"), James H.

Heffernan.  The ALJ, who decides matters as fully and finally as would the Secretary of the

Interior,[1] affirmed the Bureau of Land Management's ("BLM") decision denying Plaintiffs'

grazing applications for three allotments within the Grand Staircase-Escalante National

Monument ("the Monument").  Plaintiffs argue that the ALJ's decision was not supported by

substantial evidence and was contrary to applicable law.  At oral argument, Brandon Jensen and

_____

[1]43 C.F.R. § 4.1.

Lloyd Rickenbach represented Plaintiffs.  Assistant United States Attorney Jared C. Bennett and

Cullen Battle represented the Federal Defendants and the Interveners, respectively.  For the

reasons stated on November 2, 2007 in this Court's oral ruling as memorialized herein, this Court

AFFIRMS the Department of the Interior's January 26, 2006 decision.

## BACKGROUND

I.      **The Clark Bench Allotment**

The Clark Bench allotment consists of approximately 54,986 acres of public land

administered by the BLM.  Administrative Record ("AR") 2249; 3337.  On June 29, 2000,

Interveners Grand Canyon Trust, Canyonlands Grazing Corporation (collectively "CGC")

purchased the grazing preference[2] for the Clark Bench allotment from Brent Robinson, who had

been the permittee thereon for several years.  AR 2249-53.  In exchange for compensation, Mr.

Robinson agreed to relinquish his grazing preference and grazing permit for the Clark Bench

allotment to BLM, or alternatively, to transfer the preference to CGC.  AR 2249.  In the

agreement, the parties recognized that CGC was not yet qualified to hold the permit itself but

would become qualified in the future.  AR 2249.  Mr. Robinson agreed to graze at a reduced

level until BLM accepted a relinquishment of grazing privileges for the allotment or until CGC

requested that Mr. Robinson transfer his grazing preference to it upon becoming qualified to hold

a grazing permit.  AR 2005-06; 2250-51.

On June 29, 2000, Mr. Robinson executed a relinquishment form for the Clark Bench

---

[2]A grazing preference is a priority claim that attaches to base property so that any owner
of that base property has a preferred status to obtain the permit to graze an allotment to which the
preference pertains.  43 C.F.R. § 4100.0-5.  A grazing permit is the authorization that allows
grazing under certain terms and conditions on a particular allotment on public land.  Id.

allotment but did not submit it to BLM.  AR 1474:20 to 1476:1.  CGC and Mr. Robinson agreed

that the relinquishment form would not be submitted to BLM unless and until BLM decided to

make the allotment no longer available for grazing after completing the appropriate land-use

planning and environmental review.  AR 2001:4-15.  Even though no written document had yet

been submitted to BLM offering to relinquish the grazing preference and permit, CGC was in

contact with BLM regarding the agreement that it had entered into with Mr. Robinson so that

BLM could begin to prepare the necessary land-use planning and environmental documents to

determine whether retirement of grazing of the allotment would be appropriate.  AR 1995:21 to

1996:6.  On November 30, 2001, BLM issued a notice in the Federal Register announcing its

plans to prepare the appropriate land-use planning and environmental analysis documents.  AR

2269.  After publication of the Federal Register notice, BLM informed CGC that it needed to

have written relinquishment offers in order to perform the land-use planning and environmental

analysis.  AR 1780:1-5, 16 to 1781:1.

   In December 2001, CGC forwarded to BLM the relinquishment offer for the Clark Bench

allotment that Brent Robinson had previously signed but had not submitted to BLM.  AR

2058:14 to 2059:22; 2254; 2313-14.  The condition CGC placed on its offer to relinquish was

that if BLM was not willing to retire the grazing use on the allotments and reallocate the forage

to non-grazing use, then, pursuant to its agreement, the permit for the Clark Bench allotment

would not be relinquished.  AR 1780:16 to 1781:1; 880:9-22; 902:19 to 903:16; 2061:21 to

2062:8.

   On January 22, 2002, Plaintiff Trevor D. Stewart applied for the grazing permits on the

Clark Bench allotment.  AR 2318-23.  On January 28, 2002, pursuant to its agreement with Mr.

Robinson, CGC applied for the grazing permit for the Clark Bench allotment.  AR 2549.

      In a letter to the Utah State Director of BLM ("Utah State Director") dated April 15, 2002, CGC withdrew its relinquishment offer explaining that CGC had learned "that relinquishment is not necessary or appropriate until the land use plan has been amended."  AR 1782:7-13; 2073:17 to 2074:8; 2544.  By letter to CGC dated May 24, 2002, the State Director's delegate acknowledged the withdrawal of CGC's relinquishment offers and indicated that BLM would continue with the land-use planning and environmental analysis that BLM had undertaken as a result of the relinquishment offer being filed.  AR 2548; 2074:10-17.

      On January 29, 2003, pursuant to his agreement with CGC, Mr. Robinson transferred his preference to CGC.  AR 2570.  On February 5, 2003, CGC filed an application to obtain the Clark Bench grazing permit.  AR 2569.  On March 6, 2003, BLM offered CGC the grazing permit for the Clark Bench allotment.  AR 2593.  On March 11, 2003, CGC accepted, signed, and returned the grazing permit to BLM.  AR 2595-96.  On March 18, 2003, BLM signed and, therefore, formally approved the grazing permit to CGC.

      On March 18, 2003, after CGC had accepted the grazing permit, Plaintiff Worth W. Brown filed a grazing application for the Clark Bench allotment.  AR 135.  Plaintiff James N. Brown filed a grazing application for the Clark Bench allotment on April 7, 2003.  AR 122. Also, Plaintiff William F. Alleman filed a grazing application for the Clark Bench allotment on May 21, 2003.  AR 148.

      On September 26, 2003, BLM denied Mr. Stewart's grazing application because there was an existing permittee on the Clark Bench allotment and there was no forage available beyond what had been allocated to CGC.  AR 2614.  On March 15, 2006, BLM denied Messrs.

Alleman's, James Brown's and Worth Brown's grazing applications for the Clark Bench

allotment for the same reason.  Docket No. 38, ¶ 33.

II.     **The Last Chance and Big Bowns Bench Allotments**

The Last Chance allotment consists of approximately 258,655 acres of public land within

the Monument.  AR 3337.  The Big Bowns Bench allotment consists of approximately 17,083

acres of public land within the Monument.  AR 3337.  On November 26, 2001, Franklin

O'Driscoll, who was the permittee on the Last Chance allotment, executed an agreement with

CGC in which Mr. O'Driscoll transferred his entire grazing preference to CGC.  AR 2266-88;

2339.  On November 27, 2001, CGC applied for the grazing permit on the Last Chance

allotment.  AR 2338.

On November 29, 2001, CGC transferred 1,800 of its 3,708 active animal unit months

("AUMs") in the Last Chance allotment to Plaintiff H. Dell LeFevre.  In exchange for the 1,800

AUMs in the Last Chance allotment, Mr. LeFevre transferred all of his AUMs in the Big Bowns

Bench allotment to CGC.  BLM approved these transfers on January 30, 2002.  AR 2326-31,

2344-46, 2327, 2339, 2342, 2344, 2585-89.

On December 3, 2001, January 15, 2002, and February 23, 2002, CGC submitted written

offers of relinquishment to BLM for CGC's grazing privileges on the Last Chance and Big

Bowns Bench allotments.  AR 2313, 2314, 2457.  Similar to the relinquishment offer for the

Clark Bench allotment, CGC made these relinquishment offers contingent upon BLM approving

the retirement of grazing on the two allotments.  AR 2313, 1780:16 to 1781:1; 880:9-22; 902:19

to 903:16; 2061:21 to 2062:8.  Consequently, on January 28, 2002, BLM published a notice in

the Federal Register regarding its intent to prepare the necessary land-use planning and

environmental documents to determine whether retirement of grazing would be appropriate on the two allotments.  AR 2324.

On April 1, 2002, Mr. LeFevre filed a grazing permit application for the Big Bowns Bench allotment and the portion of the Last Chance allotment that CGC had retained.  AR 2542-43.  On April 22, 2002, Wayne G. Phillips, the father of Plaintiffs Todd and Joe Phillips, filed a grazing permit application for the Last Chance allotment.  AR 2546-47.

By letter to the Utah State Director dated April 15, 2002, CGC withdrew its above-mentioned relinquishment offers, explaining that CGC had learned "that relinquishment is not necessary or appropriate until the land use plan has been amended."  AR 1782:7-13; 2073:17 to 2074:8; 2544.  On May 24, 2002, the delegate of the Utah State Director acknowledged the withdrawal of CGC's conditional relinquishment offers and indicated that BLM would continue with the land-use planning and environmental analysis that it had undertaken as a result of the conditional offers of relinquishment being filed.  AR 2548; 2074:10-17.

On February 11, 2003, BLM issued a new permit to CGC for the Big Bowns Bench allotment and for its retained portion in the Last Chance allotment.  AR 2585-2589.  On March 18, 2003, Mr. Worth Brown filed a grazing permit application with BLM for the Last Chance and Big Bowns Bench allotments.  AR 2599.  On April 7, 2003, Mr. James Brown also filed a grazing permit application with BLM for the Last Chance and Big Bowns Bench allotments.  AR 2602.

On September 26, 2003, BLM issued two decisions, one to Mr. LeFevre and one to Mr. Phillips, denying their respective grazing permit applications for the Big Bown's Bench allotment and CGC's portion of the Last Chance allotment because CGC was the existing

permittee, and there was not any additional forage beyond what was already allocated to CGC. AR 2617-22.  On March 15, 2006, BLM issued two decisions, one to Mr. James Brown and one to Mr. Worth Brown, denying their respective grazing applications for the same reasons.  Docket No. 38, ¶ 33.

III.    **Formal Agency Adjudication Proceedings Before the ALJ**

On October 30, 2003, Messrs. Stewart, LeFevre, and Phillips all timely appealed BLM's denial of their grazing permit applications to the Office of Hearings and Appeals, Hearings Division, within the Department of the Interior.  AR at 1, 154, 302.  Even though BLM had not, at that time, acted upon the grazing applications filed by Messrs. W. Brown, J. Brown, and Alleman, the ALJ allowed them to intervene in the administrative action that Messrs. Stewart, LeFevre, and Phillips had filed.  AR at 650.

On May 9-11 and September 9-10, 2005, the ALJ presided over a formal adjudicatory hearing regarding the appeals filed by Messrs. Stewart, LeFevre, and Phillips.  AR 754, 1086, 1491, 1656, 2014.  At this hearing, the ALJ heard sworn testimony on direct and cross-examination of twenty witnesses called by BLM, CGC, and Plaintiffs.  All parties were represented by counsel.  Further, the ALJ received a total of approximately 175 exhibits into evidence from all parties.  Additionally, all parties submitted extensive post-hearing briefs.

On January 26, 2006, the ALJ issued a lengthy decision affirming BLM's September 2003 decisions denying the grazing applications filed by Messrs. Stewart, Phillips, and LeFevre. AR 4100.  Since BLM had not decided whether to approve the grazing applications filed by Messrs. James Brown, Worth Brown, and Alleman by January 26, 2006, the ALJ's decision did not adjudicate their grazing permit applications.  AR 4100.

On March 13, 2006, Plaintiffs timely filed this action for judicial review of the ALJ's decision under the APA, 5 U.S.C. § 706.  See Docket No. 1.  In this action, Plaintiffs challenge three components of the ALJ's decision.  First, Plaintiffs argue that CGC was not qualified to hold a grazing permit because it did not own livestock at the time it applied for a transfer of the grazing permits, was not in the livestock business, and did not have an intent to graze the three above-mentioned allotments ("the allotments").  Second, Plaintiffs challenge the ALJ's factual determination that CGC made conditional offers to relinquish its grazing privileges to BLM. Finally, Plaintiffs assert that the ALJ erred as a matter of law in determining that BLM regulations allow for conditional relinquishments.  After stating the standard of review, this Court addresses Plaintiffs' first challenge separately and addresses the second and third challenges together.

## ANALYSIS

### I.      STANDARD OF REVIEW

The United States Court of Appeals for the Tenth Circuit has stated that "[r]eviews of agency action in the district courts must be processed as appeals.  In such circumstances the district court should govern itself by referring to the Federal Rules of Appellate Procedure."  Olenhouse v. Commodity Credit Corp., 42 F.3d 1560, 1580 (10th Cir. 1994).  Consequently, this Court reviews the ALJ's decision as would the Tenth Circuit.  In so doing, this Court follows the rule that "[a] presumption of validity attaches to the agency action and the burden of proof rests with the appellants who challenge such action."  Colo. Health Care Ass'n v. Colo. Dep't of Soc. Servs., 842 F.2d 1158, 1164 (10th Cir. 1988).  To carry their burden to overcome the presumption in favor of the agency action, Plaintiffs must show that, based upon the entire administrative record, the factual

8

findings of the ALJ were not supported by substantial evidence.  5 U.S.C. § 706(2)(E).[3]  "Substantial evidence is 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion'".  Hendrix v. Barnhart, 313 F.Supp.2d 1222, 1223 (D. Utah 2004) (quoting Hamilton v. Sec'y of Health & Human Servs., 961 F.2d 1495, 1498 (10th Cir. 1992)).  This means that this Court cannot displace the ALJ's choice between two fairly conflicting views of the facts even though this Court may have made a different choice if de novo review were to apply.  Trimmer v. U.S. Dep't of Labor, 174 F.3d 1098, 1102 (10th Cir. 1999).

This Court reviews the ALJ's legal determinations de novo.  Thunderbird Propellers, Inc. v. F.A.A., 191 F.3d 1290, 1295 (10th Cir. 1999).  However, when reviewing the ALJ's legal determinations, this Court must give substantial deference to the agency's interpretations of a statutory provision "when it appears that Congress delegated authority to the agency generally to make rules carrying the force of law, and that the agency interpretation claiming deference was promulgated in the exercise of that authority."  United States v. Mead Corp., 533 U.S. 218, 227 (2001) (citing Chevron U.S.A., Inc. v. Natural Res. Def. Council, 467 U.S. 837, 842-43 (1984)).

Furthermore, when reviewing an agency's interpretation or application of agency regulations, the "agency's interpretation must be given 'controlling weight unless it is plainly erroneous or inconsistent with the regulation.'"  Thomas Jefferson Univ. v. Shalala, 512 U.S. 504, 512 (1994).  In other words, this Court's job is not to decide which among several competing interpretations best serves a regulatory purpose.  Instead, this Court must defer to the agency's interpretation unless an

---

[3]The substantial evidence standard of review applies to reviewing the ALJ's factual findings that were made pursuant to a formal agency adjudication subject to 5 U.S.C. §§ 556, 557.  5 U.S.C. § 706(2)(E).  This Court has already found that the administrative trial before the ALJ was a formal agency adjudication subject to 5 U.S.C. § 556.  Docket No. 99 at 3-4.

"alternative reading is compelled by the regulation's plain language or by other indications of the Secretary's intent at the time of the regulation's promulgation . . . ."  Id. (citations omitted).

II.    CGC'S QUALIFICATIONS TO HOLD A GRAZING PERMIT

The ALJ appropriately determined that CGC met all of the statutory and regulatory requirements to hold the grazing permits for the three allotments.  Under the Taylor Grazing Act ("TGA") the "Secretary of the Interior is authorized to issue . . . permits to graze livestock . . . to such bona fide settlers, residents, and other stock owners as under his rules and regulations are entitled to participate in the use of the range . . . ."  43 U.S.C. § 315b (emphasis added).  Where, as here,

> Congress has "explicitly left a gap for an agency to fill, there is an express delegation of authority to the agency to elucidate a specific provision of the statute by regulation," and any ensuing regulation is binding in the courts unless procedurally defective, arbitrary or capricious in substance, or manifestly contrary to the statute.

Mead, 533 U.S. at 227 (quoting Chevron, 467 U.S. at 843-44).  Furthermore, reviewing courts are not free to impose additional requirements in agency regulations "if the agencies have chosen not to grant them."  Vt. Yankee Nuclear Power Corp. v. Natural Res. Def. Council, 435 U.S. 519, 524 (1978).

Pursuant to this congressional delegation of authority, the Secretary has recognized two "Mandatory Qualifications" that a grazing permit applicant must meet at the time the permit is applied for to be eligible to obtain a grazing permit.  First, the applicant must own or control base property.  43 C.F.R. § 4110.1(a).  Second, the applicant must either meet citizenship requirements or be authorized to conduct business in the state in which the grazing permit is sought.  43 C.F.R. § 4110.1(a)(2)-(3).  In this action, as before the ALJ, Plaintiffs do not dispute that CGC leased and

controlled base property and has been authorized to conduct business in the State of Utah.  AR 2053:5-18; 2326-46.  Deferring to the Department of the Interior's interpretation of the TGA, as this Court must under <u>Chevron</u>, the two above-mentioned qualifications are the only "mandatory" qualifications, and substantial evidence supports the ALJ's factual findings that CGC met the two requirements of 43 C.F.R. § 4110.1(a) to hold a grazing permit.

Instead of arguing that CGC did not meet the only two mandatory qualifications, Plaintiffs argue that CGC was not qualified to hold a grazing permit because it was not a stock owner, was not engaged in the livestock business, and did not have an intent to graze.  As shown below, the ALJ correctly determined that these are not requirements to hold a grazing permit.

A.   <u>Stock Ownership</u>

The TGA allows the Secretary to issue grazing permits to bona fide residents, settlers, and "other stock owners."  43 U.S.C. § 315b.  However, the TGA gives very little clarification as to what this term means.  Pursuant to the Secretary's authority under the TGA to promulgate rules governing who is "entitled to participate in the use of the range," the Secretary has not required an applicant to be a "stock owner" at the time a permit is transferred or acquired under certain circumstances. By illustration, 43 C.F.R. § 4110.2-3 provides:

> If an unqualified transferee acquires rights in base property through operation of law or testamentary disposition such transfer will not affect the grazing preference or any outstanding grazing permit or lease, or preclude the issuance or renewal of a grazing permit or lease based on such property for a period of 2 years after the transfer. However, such a transferee shall qualify under paragraph (a) of this section within the 2-year period or the grazing preference shall be subject to cancellation.

Therefore, the Secretary has recognized instances in which an applicant need not be a "stock owner"

11

at the time of permit application, transfer, or acquisition to obtain a permit.[4]

In addition to 43 C.F.R. § 4110.2-3, the Secretary has expressly recognized other instances in which a permit applicant need not be a "stock owner" at the time of permit application, transfer, or acquisition. When promulgating its "Mandatory Qualifications" regulations, the Department made a reasoned choice to not require an applicant to be a "stock owner" at the time of permit application, transfer, or acquisition because of "the increasing number of part time ranchers, permits held by financial institutions and other non-ranching organizations, and permits where the livestock operator is in an initial developmental stage and is not yet ready to run cattle on the range." Department Hearings and Appeals Procedures; Cooperative Relations; Grazing Administration–Exclusive of Alaska, 60 Fed. Reg. 9,894, 9,926 (Feb. 22, 1995) (emphasis added). Therefore, pursuant to his authority to promulgate regulations under the TGA, the Secretary recognized that start-up grazing operations do not need to meet the "stock owner" requirement at the time of permit application, transfer, or acquisition and, thus, did not include such a requirement in those regulations.

By not requiring an applicant to be a "stock owner" at the time of permit application, transfer, or acquisition, the Department is able to accommodate a start-up grazing operation while still maintaining the integrity of the TGA. The primary purposes of the TGA are to provide for grazing on public lands designated for that use and protect rangelands from overgrazing while "stabilizing the livestock industry." Public Lands Council v. Babbitt, 167 F.3d 1287, 1289, 1298 (10th Cir.

---

[4]Plaintiffs have acknowledged that the Secretary has discretion to determine that a permit applicant need not be a "stock owner" at the time he/she applies for or acquires a grazing permit. Docket No. 50 at 34 ("[T]he test should not be whether or not an applicant owns livestock but whether or not he is a recognized operator whose failure to own livestock is only a temporary condition or is due to circumstances over which he had no control." (emphasis added)).

1999) ("Public Lands Council I").  The Department has protected the primary purposes of the TGA by allowing start-up grazing operations a reasonable period by which to establish a grazing operation or lose their grazing privileges.   Under 43 C.F.R. § 4140.1(a)(2), "Failing to make substantial grazing use as authorized by a permit or lease for 2 consecutive fee years" may in result cancellation of the grazing permit.  Obviously, if a grazing permittee has not become a "stock owner" within two years after obtaining a grazing permit, then the permit may be subject to cancellation for failing to "make substantial grazing use" of the allotment.  Given that the Department promulgated these regulations under an express congressional delegation of authority to accomplish the purposes of the TGA by stabilizing the grazing industry while protecting grazing in designated areas, these regulations are "binding in the courts."  Mead, 533 U.S. at 227.  Consequently, under certain circumstances, a permit applicant need not own stock in order to apply for or acquire a grazing permit.  AR 4130.

Even though ownership of livestock is not a requirement under the TGA at the time of application for a grazing permit, under the facts of this case, the ALJ appropriately determined that CGC was a stock owner for purposes of qualifying for the grazing permits on the allotments at issue herein.  First, substantial evidence supports the ALJ's factual finding that CGC was a "stock owner" because it owned four cattle before BLM issued the grazing permits for the allotments to CGC. Second, substantial evidence supports the ALJ's factual finding that CGC was also a "stock owner" within a reasonable time after acquiring the grazing permits for the allotments.

First, substantial evidence supports the ALJ's finding that CGC owned four head of cattle before BLM issued CGC the grazing permits for the allotments.  On January 28, 2002, before BLM approved the transfers of the grazing permits for the allotments, CGC paid the trespass fees for its

predecessor-in-interest who had abandoned his cattle on the Last Chance allotment.  AR 2053:19 to

2055:4; 2162:21 to 2163:21; 2687.  From this transaction, CGC obtained four cattle to which

Plaintiff Dell LeFevre affixed CGC's brand.  AR 1200:14-17.  Indeed, given that these four cattle

were obtained and branded before CGC acquired the permits shows that CGC was a "stock owner."

Second, even if CGC did not own cattle at the time of permit application or acquisition,

substantial evidence shows that it was a start-up grazing operation that was entitled to the reasonable

time afforded under the Department's regulations to become a "stock owner."  In addition to the four

cattle that CGC owned in January 2003, CGC acquired more cattle so that by the time of the hearing

in May 2005, CGC owned 20 head of cattle on the allotments.  AR1207:10-13.  In fact, based on the

substantial evidence submitted at the hearing regarding CGC's stock ownership, the ALJ found that

CGC has

> become a classic example of a grazing success story.  What began as a few inherited
> cattle . . . and then grew into a small herd of some 20 cattle at the time of BLM's
> Decisions on appeal herein [AR 1207:10-13], has subsequently grown into the
> acquisition of the Kane and Two-Mile ranches on the so-called Arizona Strip.  [AR
> 1203:16 to 1204:4].  With these acquisitions, [CGC] has become one of the largest,
> active grazing permittees in the Southern-Utah, Northern-Arizona region . . . .  With
> the acquisition of the Kane and Two-Mile ranches in 2005 for some $4.5 million [AR
> 2107:6-8], [CGC] has become a much bigger, active grazing permittee than any of
> the [Plaintiffs] in this case, thereby proving the wisdom of BLM in transferring
> permits to [CGC] when it was merely a start-up organization.

AR 4131.  Accordingly, even if CGC was not a "stock owner" at the time that it obtained its permits,

it was entitled to the time afforded under the Department's regulations to become a "stock owner";

a requirement which CGC clearly has fulfilled.

B.      Engaged in the Livestock Business

Neither the TGA nor its implementing regulations require that a permit applicant be engaged

14

in the livestock business to hold a grazing permit.  In 1995, the Department promulgated amended grazing regulations that eliminated the requirement that a permit applicant be "engaged in the livestock business."  Public Lands Council I, 167 F.3d at 1305.  Certain groups appealed this change in the regulations, asserting that it violated the TGA.  Id.  On appeal to the Tenth Circuit, the court held that "the TGA does not require applicants to be engaged in the livestock business to qualify for a grazing permit . . . ."  Id.  In fact, the court stated that "there is not even a colorable argument that [43 U.S.C. § 315b] requires the Secretary to issue grazing permits only to those engaged in the livestock business."  Id. at 1306 (emphasis in original).  The United States Supreme Court unanimously affirmed the Tenth Circuit's decision.  Public Lands Council v. Babbitt, 529 U.S. 728, 745-48 (2000) ("Public Lands Council II").  Thus, the ALJ correctly held that being engaged in the livestock business is not a requirement to hold a grazing permit.

   C.  Intent to Graze

   Neither the TGA nor its implementing regulations require a permit applicant to harbor an intent to graze in order to be qualified to hold a grazing permit.  In addition to being legally unfounded, imposing an "intent to graze" standard would be practically unworkable and wholly unnecessary.  First, an "intent to graze" standard would be practically unworkable because it would necessarily transform agency personnel who are trained to administer the rangeland into judges of subjective intent.  Under an "intent to graze" standard, BLM employees would be required to determine: (1) what is an acceptable intent, (2) how such intent should be expressed to BLM, (3) whether the respective applicant was being truthful in expressing such intent, and (4) what should be the consequences when an applicant obtains a permit based on such representations and then fails to act consistent with its expressed intention for any number of reasons.  Indeed, adjudicating the

15

credibility of an applicant's intent to graze are duties far afield from those of BLM employees who administer public rangeland. If either Congress or the Department intended to impose such a heavy burden on BLM, it would have expressly so stated.

Second, an "intent to graze" standard is wholly unnecessary because the TGA's implementing regulations provide an objective means of preventing permittees who lack an intent to graze from continuing to hold a grazing permit. Under 43 C.F.R. § 4140.1(a)(2), BLM may cancel a grazing permit if the permittee does not make substantial use thereof. This regulation does not suffer from the same infirmities as Plaintiffs' "intent to graze" standard because the Department's regulations are consistent with the duties of employees who administer the public rangeland. Accordingly, the ALJ correctly determined that an intent to graze was not a mandatory qualification to hold a grazing permit.[5]

III.    CONDITIONAL RELINQUISHMENTS

Substantial evidence supports the ALJ's factual finding that CGC did not relinquish its grazing permits for any of the allotments. In December 2001, CGC sent conditional relinquishment offers to BLM for the Last Chance and Big Bowns Bench allotments in addition to forwarding to BLM the relinquishment offer for the Clark Bench allotment that Brent Robinson had previously signed but had not submitted to BLM.[6] AR 2058:14 to 2059:22; 2254; 2313, 2314. The condition

_____

[5]Finally, CGC is not engaged in conservation use under Public Lands Council I. 167 F.3d at 1308. Substantial evidence supports the ALJ's findings that CGC has grazed two of the permits (Last Chance and Clark Bench) while it waits for BLM to determine appropriate grazing levels for the third (Big Bowns Bench), and that CGC has fully complied with BLM regulations regarding grazing use since it obtained the permits.

[6]Brent Robinson's testimony does not contradict this factual finding because Mr. Robinson could not remember whether he ever submitted the relinquishment to BLM or left it with the title company when he closed his permit transaction with CGC. AR 1474:20 to 1476:1.

CGC placed on its offer to relinquish was that if BLM determined not to retire grazing on the allotments and reallocate the forage to non-grazing use, then CGC would not relinquish the permits. AR 1780:16 to 1781:1; 880:9-22; 902:19 to 903:16; 2061:21 to 2062:8.  Even after CGC complied with BLM's request to resubmit the offers in unconditional form, substantial evidence supports the ALJ's finding that BLM supervisory management continued to treat them as proposals to relinquish, contingent upon the land use plans being amended to retire grazing in the pertinent allotments.  This evidence establishes that there was always a clear, mutual understanding that the offers would not be accepted unless the land use plans were amended and grazing retired on the allotments.  The ALJ found that there was "really no dispute in the record that BLM considered these relinquishment letters to be conditional proposals to relinquish."  AR 4123.  This factual finding is based on the uncontroverted testimony of both David Hunsaker, Manager of the BLM office in the Monument, and William Hedden, President of CGC.  AR 889:15 to 890:9; 893:6-9; 902:19 to 903:16; 908:1-12; 1780:16 to 1785:10; 1958:3-7; 2060:12 to 2061:20.  After extensive direct and cross-examination of Mr. Hunsaker, the ALJ specifically found that Mr. Hunsaker's testimony was credible because "Mr. Hunsaker's decision making in these consolidated cases reflects independent and well-reasoned determinations, which he ably defended from his management perspective in <u>very persuasive testimony</u>."  AR 4135-36 (emphasis added).  Therefore, the ALJ's factual finding that BLM considered CGC's relinquishment offers to be conditional is supported by substantial evidence.[7]

_____

However, Mr. Robinson's "gut feeling" was that he left the relinquishment with the title company, not with BLM.  AR 1475:17-18.

[7]In response to the ALJ's analysis, Plaintiffs argue that substantial evidence does not support the ALJ's factual finding that CGC's relinquishment offers were conditional because BLM required CGC to submit "unconditional" relinquishment offers based on a BLM employee's reading of the BLM Handbook.  Even assuming that BLM could lawfully impose the

Substantial evidence supports the factual finding that CGC withdrew its conditional relinquishment offers before BLM completed the land-use planning process or before BLM accepted them. On April 15, 2002, CGC withdrew its conditional relinquishment offers in writing to the Utah State Director once CGC learned "that relinquishment is not necessary or appropriate until the land use plan has been amended." AR 1782:7-13; 2073:17 to 2074:8; 2544. By letter dated May 24, 2002 to CGC, the Utah State Director's delegate acknowledged the withdrawal of CGC's conditional relinquishment offers. AR 2548; 2074:10-17. Despite the withdrawals of the conditional relinquishment offers, the Utah State Director decided to complete the land use planning and environmental analysis documents BLM had undertaken as a result of the relinquishment offers being submitted. AR 868:7 to 869:20; 2074:10-17; 2548; 2556-2560. Mr. Hunsaker testified that once CGC withdrew its relinquishment offers, BLM could no longer accept them and, therefore, no relinquishment occurred. AR 871:9-16. Thus, substantial evidence supports the factual findings that CGC withdrew its relinquishment offers before BLM could have accepted them.

In addition to challenging the ALJ's factual determination that CGC's offers of relinquishment were conditional, Plaintiffs also contend that BLM cannot accept conditional relinquishments as a matter of law. However, this Court in its de novo review of this legal question could not find any statute, including the TGA, that prohibits conditional relinquishment offers of grazing permits. This conspicuous omission of statutory authority is significant because when Congress wants to prohibit conditional relinquishments, it says so in unambiguous language. See,

---

requirements of its handbook on the public, reading the record as a whole, it is abundantly clear that there was always a mutual understanding between BLM and CGC that the offers of relinquishment would not be accepted unless the land use plans were amended and grazing retired.

e.g., 30 U.S.C. § 187b (stating that an oil and gas lease relinquishment "shall be effective as of the date of its filing"). Congress has not proscribed conditional relinquishments of grazing permits.

Further, Plaintiffs did not cite any regulation that prohibits conditional relinquishment of grazing permits. The closest Plaintiffs came to providing regulatory authority to support their argument is 43 C.F.R. § 1825.11, which provides: "Generally, BLM considers a relinquishment to be effective when it is received, along with any required fee, in the BLM office having jurisdiction of the lands being relinquished. However, the specific program regulations govern effectiveness of relinquishments." Therefore, Plaintiffs argue, since specific program regulations do not state when relinquishments of grazing permits are effective, grazing permits fall within the general rule that relinquishments are effective upon presentation to BLM.

The ALJ, who acts on behalf of the Secretary of the Interior under 43 C.F.R. § 4.1, reasonably interpreted 43 C.F.R. § 1825.11 to mean that BLM has discretion to accept a conditional relinquishment offer of a grazing permit. This interpretation of the regulation

> must be given "controlling weight unless it is plainly erroneous or inconsistent with the regulation." Id. In other words, we must defer to the Secretary's interpretation unless an "alternative reading is compelled by the regulation's plain language or by other indications of the Secretary's intent at the time of the regulation's promulgation."

Thomas Jefferson Univ., 512 U.S. at 512.

The ALJ's interpretation of 43 C.F.R. § 1825.11 is not "plainly erroneous" because its plain language does not even mention "conditional relinquishments" much less prohibit them. When the Department wants to proscribe conditional relinquishments, it does so in unambiguous language. 43 C.F.R. § 2521.9 ("Conditional relinquishments [of desert land entry] will not be accepted."). Further, even if section 1825.11 were to apply to conditional relinquishments, its plain language does

19

not compel Plaintiffs' reading.  As the ALJ stated in his decision, the term "generally" implies discretion to determine when a specific set of circumstances may allow departure from an agency practice that may usually be followed.  Also, the plain language of the term "considers" is not mandatory in nature.  Additionally, the Department has interpreted both the TGA and the Federal Land Policy and Management Act ("FLPMA")[8] to require BLM to initiate the land use planning process before deciding whether to accept an offer to relinquish a grazing permit.  AR 2675-76. Therefore, a permissible reading of this regulation does not make relinquishment of a grazing permit immediate as a matter of law, but rather provides the BLM with discretion to consider conditional relinquishment offers.  Given the foregoing, the ALJ's interpretation of 43 C.F.R. § 1825.11 has controlling weight in this action.  Consequently, the ALJ's determination that CGC did not relinquish its grazing permits for the allotments is supported by substantial evidence and is correct as a matter of law.

## CONCLUSION

For the reasons stated above, this Court affirms the ALJ's decision in toto.  The Clerk of the Court is ordered to enter judgment in favor of the Defendants and close the case with each party to bear its own costs.

DATED this 7th day of January, 2008.

_Tena Campbell_
_____
TENA CAMPBELL, CHIEF JUDGE
United States District Court

_____

[8]43 U.S.C. §§ 1701 to 1784.